IN THE UNITED STATES DISTRICT COURT
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 11-cr-00519-WYD

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

PHILIP CHAOHUI HE, a/k/a PHILIP HOPE, a/k/a PHILIP CHAOHUI,

    Defendant.

_____

**REPORTER'S TRANSCRIPT**
(Sentencing Hearing)

_____

        Proceedings before the HONORABLE WILEY Y. DANIEL,

Judge, United States District Court for the District of

Colorado, commencing at 10:12 a.m., on the 18th day of

December, 2013, in Courtroom A1002, United States Courthouse,

Denver, Colorado.

**APPEARANCES**

        Matthew T. Kirsch, Attorney at Law, U.S. Attorney's

Office-Denver, 1225 17th Street East, #700, Denver, CO 80202,

appearing for the plaintiff.

        Robert William Pepin, Attorney at Law, Office of the

Federal Public Defender, 633 Seventeenth Street, #1000, Denver,

CO 80202, appearing for the defendant.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Gwen Daniel, 901 19th Street,
Room A259, Denver, Colorado, 80294, 303.571.4084

1       **PROCEEDINGS**

2           (In open court at 10:12 a.m.)

3           THE COURT:  This is 11-cr-519 USA vs. Philip Chaohui.

4   Will counsel enter their appearances.

5           MR. KIRSCH:  Morning, your Honor.  Matthew Kirsch for

6   the United States.

7           MR. PEPIN:  Robert Pepin appearing on behalf of

8   Mr. He, your Honor.  He's present and in custody.  He does not

9   need the services of an interpreter.

10          THE COURT:  Is she here then on a standby basis or do

11  you want her to be excused?

12          MR. PEPIN:  Standby would be fine.

13          THE COURT:  All right.  Let's have then Ms. Yan sworn

14  in.

15          (Interpreter sworn.)

16          THE COURT:  Now I am going to direct the defendant to

17  signal to the interpreter if he actually needs her services.

18          MR. PEPIN:  Thank you.

19          THE COURT:  Let's make a record.  I want to make some

20  observations before I hear from the parties on the one disputed

21  issue.  Have both sides have received and reviewed the

22  Presentence Investigation Report, including all addenda?  If

23  so, indicate that.  And further indicate if you have any

24  objections to the contents of the report, including the

25  advisory Guideline calculation and sentencing recommendation of

1    46 months.

2         MR. KIRSCH:  Your Honor, the government has received

3    all of those documents and has no objections to any of their

4    contents or to the sentencing recommendation.  In fact we are

5    going to make the same sentencing recommendation today.

6         MR. PEPIN:  Your Honor, the defense has received the

7    documents referred to by the Court.  With regard to objections,

8    the Court will note that we filed a response which objected to

9    certain information.  I know that it's been responded to to

10   some degree by the Probation Department referring to the

11   specific addendum to the Presentence Report, document 48, which

12   talks about our objections.

13        The problem I've got with that is that it doesn't

14   fully state our objections.  It addresses them.  I don't expect

15   there's going to be a different response by the Probation

16   Department.  But I feel as if our actual language as opposed to

17   a paraphrasing, with the added word "actually," which I see as

18   diminishing the impact or the intent of our statement, is less

19   than complete.  And I ask that the actual contents of our

20   response, which is not all that lengthy, be a part of the

21   objection, which is part of the Presentence Report.

22        THE COURT:  Now your objections, however, don't really

23   impact -- have an impact on the advisory guideline range, do

24   they?

25        MR. PEPIN:  That's correct, your Honor, they do not.

1    And I guess I should complete my comments, and that is we don't

2    have any objection to the Sentencing Guideline range.  Of

3    course we're asking for a sentence other than that which is

4    recommended by the Probation Department.

5             THE COURT:  I understand that, of course, you have

6    filed a motion for what you call a statutory sentence and

7    through that motion you are requesting a sentence 24 months.

8             MR. PEPIN:  That's correct.

9             THE COURT:  Do you want me to comment on these

10   objections or are you just asking that the full scope and body

11   of your objections be somehow incorporated in the PSI?  Is that

12   what you are saying?

13            MR. PEPIN:  I am asking that the Court order that the

14   full scope and body of my objections be incorporated into the

15   PSI.

16            THE COURT:  Is there any objection to that by

17   probation or Mr. Kirsch?

18            MR. KIRSCH:  Your Honor, I don't have any objection to

19   that.  The government's response to that objection would simply

20   be that the government would agree that what Mr. Pepin reports

21   was said by Mr. He was in fact said by Mr. He.  The government

22   is not in a position to agree with the assertions about what

23   Mr. He's actual beliefs at the time were.

24            THE COURT:  All right.  Let me do this.  Ms. Kozak,

25   what do you want to say about this?

```
 1            THE PROBATION OFFICER:  I guess I don't know what
 2   Mr. Pepin wants, his to be incorporated by the PSR.  Because if
 3   he wants his objections to be incorporated into the PSR, I am
 4   assuming he wants that so it goes to BOP.  But I don't know
 5   exactly what he wants me to incorporate as his objection.  I am
 6   not going to state verbatim what he said in his objection.
 7   That doesn't make any sense.  I paraphrased what his objection
 8   was, and my response was that the information I got that I put
 9   in the additional information section of the Presentence Report
10   I actually got when I spoke with the case agent.
11            I don't know what exactly he wants me to incorporate
12   as his objection, since it's already been filed and made of
13   record.  So I don't know what he wants me to incorporate.
14            MR. PEPIN:  Your Honor, I will be happy to outline the
15   paragraphs I am referring to.  And again we are going to
16   document No. 45.
17            THE COURT:  I really don't -- document 53 -- where is
18   it?  Are your objections in 46?
19            MR. PEPIN:  My objections are --
20            THE COURT:  Where are your objections filed?
21            MR. PEPIN:  45.
22            THE COURT:  45.  I am sorry.  It's in the document
23   entitled "Response to Presentence Investigation Report," and I
24   did look at that.
25            MR. PEPIN:  Correct.
```

1      THE COURT:  Let me just -- when all this is packaged

2 up and sent to BOP, will BOP get document Nos. 45, 46 and 53?

3 45 is the response to the Presentence Investigation Report, 46

4 is Mr. Pepin's motion for a statutory sentence, and 53 is the

5 government's opposition to the motion for statutory sentence.

6      Will that be included in what goes to BOP or not,

7 Ms. Kozak?

8      THE PROBATION OFFICER:  No, your Honor.  But if the

9 parties want it to be of record, that those documents do make

10 it to BOP, I can do an addendum after sentencing so those

11 documents are attached.  Because all -- the only thing that BOP

12 will get is the Presentence Report and any addendum and any

13 attachments to the Presentence Report, but they do not get

14 motions and things like that that are filed by the parties.

15      THE COURT:  I guess what -- I feel uncomfortable,

16 Mr. Pepin, ordering Ms. Kozak to somehow expand her addendum to

17 include verbatim your objections.  However, I don't have any

18 problem with your objections as you filed them and the

19 government's response being included with what goes to BOP.

20 That seems to be a fair way to do it.

21      MR. PEPIN:  Well and, your Honor, if we're talking

22 about the response, that being document 45, that's fine with

23 me, because then it would be included I assume as part of the

24 package that anyone who has reason to look at the Presentence

25 Investigation Report would see.

1          My problem is this:  Paraphrasing my objections puts a

2     particular taint to them, and it is a taint which is consistent

3     with the response by the probation to my objections.  And in

4     this particular instance it's not huge, but I consider it to be

5     significant.

6          And my objections are not lengthy.  Frankly, you are

7     not going to end up with a much longer objection reference in

8     the addendum than there is now if you put -- or if someone,

9     Ms. Kozak, or whoever, would put in my specific objections.

10    This is not one of those objections that's like several pages.

11         If she's got an objection to it, fair enough, but I

12    don't agree with the objection, and it's -- I consider it to be

13    a taint and I -- or a leaning a particular way.

14         And so I think that my specific objection should be

15    included, and I can give you the specific paragraphs that I am

16    referring to.

17         THE COURT:  Well, here's what I am going to do.  I am

18    going to rule -- modify part of what I said.  I think the only

19    thing we need to include as part of a separate addendum or as a

20    part of the addendum that's document No.48 would be just to

21    include Mr. Pepin's response.

22         MR. PEPIN:  That would be 45, not the other two.

23         THE COURT:  We don't need the other two.

24         MR. PEPIN:  Right.  That's fine.

25         THE COURT:  We don't need documents 46 and 53, we just

1     need 45.  Do you have any objection to that, Mr. Kirsch?

2              MR. PEPIN:  I don't as long as it's characterized as

3     an addendum, which would mean I assume it would be attached to

4     the Presentence Investigation Report as part of that packet.

5              THE PROBATION OFFICER:  Your Honor, what will happen

6     is after sentencing I will do a second addendum and that

7     addendum will say at sentencing the Court ordered that document

8     45 be made a part of the record, attach it to the Presentence

9     Report, and it will be a part of the record.

10             MR. KIRSCH:  I have no objection.

11             THE COURT:  Let's do that.  That way we don't sort of

12    expand the bureaucracy here, the paper.

13             Now I want to sort of -- before we hear some argument

14    about what a just and proper sentence is under 18, United

15    States Code, Section 3553 I want to make some observations.

16             When we had the change of plea on this I was struck by

17    a couple of things:  One, that this was a serious offense and

18    is a serious offense, and the Arms Export Control Act I think

19    is a significant act.  And when people intentionally smuggle

20    items, in this case these circuits, in violation of the act, to

21    a country that -- where the United States would have an intent

22    to enforce this law, I am talking about China now, concerns me.

23             What concerns me is significantly I went back and

24    reread the Plea Agreement and the Presentence Investigation

25    Report, which tracks verbatim the information that's sets forth

1    in the Plea Agreement.  There appear to be -- again, I want

2    Mr. Pepin and his client to respond to this, there appear to be

3    some aggravating factors here.

4          First off, in his letter to the Court the defendant

5    expressed his love for the United States and his love for his

6    family, but then at some point he said he got greedy.  And he

7    did get greedy, and he got involved in a scheme that he knew or

8    should have known was legal -- illegal, not legal, illegal, and

9    further what he was doing was a serious violation.

10         And the letter says more than that, but the defendant,

11   to his credit, has taken responsibility for his wrongful

12   conduct.  But I want to talk a little bit about the wrongful

13   conduct, because there are some aspects that appear to be

14   aggravated.  I don't mean aggravated in the sense that I am

15   going to give an upward adjustment, that's not what I am

16   talking about, but aggravating in a way that would tend to

17   undermine and discredit Mr. Pepin's request for a 24-month

18   sentence.  So I want to pick up some of the things that are in

19   the Presentence Investigation Report.

20         Paragraph 11.  The prior paragraphs talks about his

21   dealings with the co-conspirators, the money that was sent to

22   him, and these next paragraphs talk about what he did with the

23   money and how he used the money to acquire these integrated

24   circuits, how he lied about the fact that there would be

25   compliance with this federal statute.  It was violated.  He may

1 have lied about his intent to send these to China.  He went to

2 Mexico to ensure the shipment of the first 112 circuits to

3 China.  And then when he got arrested he had another 200

4 circuits that he was about to ship, and these circuits were put

5 in some sort of infant bottles.

6        And so some of these factors appear to make it clear

7 to me that he really intended to violate this law.  He knew

8 what he was doing, and he was bending over backwards to make

9 sure he didn't get caught.

10        So let's pick up at paragraph 11, which says:  On or

11 about May 17, 2011, in response to the inquiry by Aeroflex, the

12 defendant provided Aeroflex with a document entitled

13 "Department of State End User Certificate and Accountability

14 Plan," which stated that SEI agrees to comply with U.S. export

15 laws governed by the ITAR, all capitalized, Title 22, Code of

16 Federal Regulations, Sections 120-130, U.S. Department of State

17 Directorate of Defense Trade Controls, DDTC, administers the

18 ITAR and regulates the export of defense articles.  It is the

19 policy of the United States to deny licenses and other

20 approvals for exports of defense articles destined for China in

21 accordance with Title 22 C.F.R. Section 126.1(a).

22        Paragraph 12 of the Presentence Investigation Report:

23 On or about May 31, 2011, the defendant, in response to

24 Aeroflex's stated concern of the possibility that SEI would

25 export the integrated circuits outside the United States and

1    violate the law, stated to Aeroflex representatives that he did

2    not have any plan to export the integrated circuits.  The

3    defendant stated that the purchaser and end user was SEI in

4    Oakland, California, and that the integrated circuits were for

5    domestic users only.

6         Well, if that statement was made, and I would have to

7    assume it was made, it signals two things, the defendant knew

8    or should have known that the real destination of these

9    integrated circuits was in fact China, and that he then lied to

10   his employer in a way that indicated that he did not intend to

11   export the integrated circuits to a country where such

12   exportation would be in clear violation of federal law.  And

13   then he further said that the end user of these circuits, when

14   he knew that wasn't true, was SEI in Oakland, California, as

15   opposed to the inappropriate, illegal and improper uses in

16   China.

17        Paragraph 13:  During the period of the purchase of

18   the integrated circuits, the defendant corresponded frequently,

19   both through telephone calls and e-mail communication, with

20   unknown and unidentified co-conspirators.  Corresponding

21   telephone calls were phone numbers originating in China.

22        So the records demonstrated -- my comment now is the

23   records demonstrated the defendant was corresponding with

24   individuals in China about things regarding the purchase of

25   these integrated circuits, and by doing that he knew very

1    clearly that he was dealing with individuals in China who

2    wanted these products and they wanted them in a way that would

3    constitute a violation of applicable federal laws.

4         All right.  Continuing on.  Paragraph 14:  On or about

5    July 28, 2011, the defendant received the first two shipments

6    of integrated circuits from Aeroflex in Colorado to the SEI

7    office in Oakland, California.  The first shipment consisted of

8    approximately 112 integrated circuits, part number, and I won't

9    read the part number, Aeroflex item number, I am not going to

10   read that, which were listed as a defense article on the USML

11   and restricted for export from the United States.  The shipment

12   was signed for and received by S. H. at the SEI office.

13        All right.  Paragraph 15 of the PSI:  During the first

14   week of September, 2011, the defendant traveled to Tijuana in

15   the Republic of Mexico with the integrated circuits from the

16   first Aeroflex shipment stowed in a backpack.  Meaning he put

17   the integrated circuits in a backpack, left the United States

18   and went to Mexico.  Well, why did he go to Mexico?

19        All right.  Let's read the rest of paragraph 15:  The

20   defendant previously removed the integrated circuits from the

21   original packaging configuration, which included a sterile

22   protective layer to eliminate exposure to the environment.

23   While in Mexico the defendant participated in a prearranged

24   meeting with a co-conspirator.  At the meeting the defendant

25   provided the 112 integrated circuits he had purchased from

1    Aeroflex to the co-conspirator.  After passing off the

2    integrated circuits, the defendant went to the airport in

3    Tijuana, Mexico, and boarded a flight to Shanghai, China.

4    While in China he met with an unidentified co-conspirator who

5    promised him future rewards, including 25,000 RMB,

6    approximately $3800, U.S. dollars, for his efforts.

7         Then 16, 17 and 18 I will do my best to paraphrase

8    although I want to read some of this.  Paragraph 16:  On or

9    about October 6, 2011, defendant received the second shipment

10   of integrated circuits from Aeroflex.  The order consisted of

11   approximately 200 integrated circuits, part number, and I am

12   not going to read it, which were listed as defense articles on

13   the USML, and again restricted for export from the United

14   States.  S. H. also signed for and received the shipment.

15        Then paragraph 17, which is also I think significant

16   here:  On or about December 11, 2011, the defendant drove to

17   the Port of Long Beach, California.  The integrated circuits

18   contained in the second Aeroflex shipment were inside the trunk

19   of the defendant's vehicle.  So just like when he took them to

20   New Mexico in the backpack, the shipment one actually went to

21   China, then shipment two he had them stuffed in his trunk so

22   nobody would see them.  The 200 integrated circuits had

23   previously been transported -- I am back to reading 17,

24   paragraph 17.  The 200 integrated circuits had previously been

25   transported from the SEI office to the residence of the

1   defendant and S. H. in Oakland, California, where they were

2   repackaged by the defendant and S. H. and placed inside several

3   plastic infant formula containers with blue tops.  The formula

4   containers were inside several boxes that were labeled with the

5   name "Wang Lu" as well as additional Chinese lettering --

6   markings.  And as noted further here, the containers held a

7   total of 200 integrated circuits.

8        Paragraph 18, I am not going to read that, this just

9   talks about what happened when the defendant was arrested.

10        So while I don't want to disrespect, understate or

11   ignore the positive things the defendant has done while he's

12   been incarcerated -- I read the letters and saw pictures, and

13   the defendant paints himself as a law-abiding citizen up to a

14   point, but someone who devoted his life to this country.  Well,

15   people that devote their life to the country are supposed to

16   obey the laws of the country.  And what I think needs to be a

17   higher focus here is the conduct of the defendant.  I am

18   troubled by this conduct.  I don't understand how this

19   conduct -- or why this conduct shouldn't trump what would

20   otherwise be a strong case for a variance.

21        The problem is if Mr. He had been a passive

22   participant in this, and others had done what I just read, then

23   maybe the variance would make more sense to me, but it's just

24   the opposite.  Mr. He was the main one that lied to his

25   employer, did this over a period of months, had multiple

1   opportunities to withdraw from this illegal activity, but

2   instead re-intensified his efforts.  And he was the one that

3   took these integrated circuits in a secretive and furtive

4   manner from the United States first to the Republic of Mexico,

5   then he put them in these infant bottles, baby bottles, had

6   them in the trunk of his car, and it was his intent to ship 200

7   more to China if he hadn't been caught.

8        I don't understand, Mr. Pepin, how this conduct

9   justifies a variance.  And I certainly don't understand how it

10  justifies a variance to 24 months.  So I want you to go first.

11       I want you to explain to me how, in looking at the

12  3553(a) factors, and when we take into account the paramount

13  importance of ensuring that the sentence imposed addresses --

14  the need for the sentence imposed to reflect the seriousness of

15  the offense, promote respect for the law and to provide just

16  punishment for the offense, how a 24-month sentence is proper.

17       Now related to that, the government submitted

18  sentencing statements from other courts that has sentenced

19  defendants who were similarly charged, and those sentences - I

20  looked at these - seem to be in a range that's consistent with

21  the 46-month sentence.

22       So I am just having trouble getting my arms around why

23  leniency is warranted in this case.  And I have no problem with

24  it being requested, but when I looked at the defendant's

25  actual -- his actions, how long they lasted, what he did, how

1    he did it, it appears that he had a very affirmative desire to

2    take up his desire to be greedy in ways that were in clear

3    violation of United States laws, and he did it, and he did it

4    in a way that he hoped would avoid detection, and of course he

5    got caught.

6              So let me have you go first, please.

7              MR. PEPIN:  May I say, your Honor, I appreciate the

8    Court's comments.  It does give me something to focus on, and

9    it reaffirms my gratitude that I have an opportunity to speak

10   and tell you exactly what it is that we're asking for and why.

11             If I could ask the Court, does the Court believe that

12   we're trying to suggest that Mr. He did not know he was sending

13   this to the country of China?

14             THE COURT:  No, no, no.

15             MR. PEPIN:  Okay.  I just wanted to make sure.

16             THE COURT:  No.  Here's what I am saying.  You're

17   asking for a significant reduction in his sentence, and what

18   you focus on in your motion has to do with his conduct up until

19   this offense and his behavior while he's been incarcerated.

20   And all of that is exemplary.  But your motion is real skimpy

21   on his conduct related to the offense.

22             I am not suggesting that you don't acknowledge that he

23   violated the law.  You also acknowledge it was a serious

24   offense, so I am not quarreling with that.  But when I went

25   back and re-read the Plea Agreement -- I was concerned about it

1    at the change of plea, and I still remain concerned about the

2    degree and extent of his personal involvement in making all of

3    this happen.  And to the extent that you agree with what I

4    read, how do you reconcile that with giving this guy, your

5    client, basically almost a 50 percent break in his sentence?

6            MR. PEPIN:  Well, if I could start with, though -- and

7    I am glad that you acknowledge the fact that we acknowledge

8    that this is a serious offense and, of course, that he has

9    committed a crime.  And every fact that you have just

10   articulated is part of the picture as to the commission of the

11   crime.  It's no surprise that he committed a crime and it's no

12   surprise that he committed this one.

13           I do have to correct the Court on one small thing, and

14   that is it's not a question of him lying to his employer.

15   Aeroflex is a different corporation altogether.  It's the place

16   that he was ordering the parts from.  It was not his employer.

17   To what degree that matters, it may not, I am not sure that it

18   bears significant weight.

19           THE COURT:  I agree with what you just said.  Okay.

20           MR. PEPIN:  We have to some degree touched in our

21   motion on the -- on the nature and circumstances of this case

22   and of this offense as required by the statute.  And I would

23   like to articulate further.

24           Number one, please understand that if we were

25   arguing -- or if we believed that Mr. He had played a minor

1    role, we'd be seeking a minor role reduction.  We have not done

2    that.  And the sentencing range that we're talking about

3    acknowledges -- that is here, just in terms of the calculation,

4    doesn't suggest that he should receive a reduction for a minor

5    role.

6            But I am happy to address the facts and circumstances

7    of the case and all of those things that you just articulated

8    he did, he's admitted to doing.  I think, however, that perhaps

9    a little bit of reality and perspective with regard to Mr. He,

10   his place in this, how this came about, what I believe is part

11   of what happened in terms of how this whole offense came about

12   and how he came to be involved in it, and comparing this to

13   other cases of this ilk are very, very significant here.

14           To begin with let me just, as unfortunately Mr. Kirsch

15   and anyone who has been in contact with me during the course of

16   this case, let me give you just a little bit of my perspective

17   and why I see things the way I do.  And that is that there was

18   a person or entity or group of people in China -- this is why

19   it was so important to me to make it clear that there is

20   nothing Mr. He has said about him giving -- sending stuff --

21   sending these materials to the Chinese government.  That was

22   never the case with regard to him.  I think it was an important

23   distinction between him and all of these other cases that the

24   government has talked about and that I made reference to.

25           And here's why that's important.  Forty years ago,

1    when I was a soldier, I was an infantryman in Berlin.  In

2    Berlin in those years of course we were in the midst of a Cold

3    War, and the city I was stationed to was 110 miles behind what

4    was considered enemy lines surrounded by the famous wall.

5           We were -- and I was a lowly private.  The highest I

6    ever got was an E-4.  But we were beat on.  We were told

7    constantly, we were warned constantly about what we could

8    expect from the folks around us, from the Russians, from the

9    east Germans.  And that's that they would and were regularly on

10   a mission to try to get into us, get into our systems, to learn

11   things about us, and that they -- you could expect manipulation

12   of all forms - sexual manipulation, monitoring manipulation,

13   relationships, friendships, all kinds of things that could take

14   you and make you into a position where you were vulnerable;

15   that these were professional people, that they were wily, that

16   they were experienced, that they had whole countries behind

17   them.

18          And that is exactly what I believe happened here.  You

19   are talking about professional, careful, experienced people in

20   China, maybe associated with the government, I would say maybe,

21   even as we look at all this, at least the possibility of it,

22   who make it their life's work to try and get these kind of

23   materials into China, including taking someone, working them,

24   manipulating them, flattering them, putting them into a

25   position where they believe that they are actually involved in

1   a business community.  And if they fudge a little rule this

2   way, they can actually have some possibility of later on being

3   rewarded.  And when I say "rewarded," by having a successful

4   business.

5          And that is the position that Mr. He was in.  I mean

6   he had people -- he didn't know who these people were.  He met

7   a man in China.  The man in China suggested a business

8   opportunity, and then he was in contact with him on a regular

9   basis.  And he ended up violating the law as a result of it.  I

10  don't think there's -- I mean we don't -- we don't say that

11  that didn't happen.  We're not suggesting that it didn't

12  happen.  But that is the context.

13         And an important thing, and this is why these other

14  cases that we see referred to by the government, and that I

15  referred to, here's why those other cases are different and why

16  the sentencing ranges are different.  And I will work my way

17  through them.

18         The one that I made reference to in my motion, which

19  had to do with a Mr. -- I believe it's pronounced -- it's

20  X-I-A-N, Xian, or something to that effect, and Li Li.

21         **Here's what happened with those people.  There were**

22  **thousands of microchips, not 312, thousands of microchips that**

23  **they were in the process of getting into the hands of China.**

24  **And they were not getting into the hands of somebody talking**

25  **about a business opportunity, they were getting them into the**

1    **hands of the China Aerospace Science and Technology**

2    **Corporation, the weapons developers.  They knew who they were**

3    **giving this stuff to and the potential purpose for it, the**

4    **military purpose, the armaments, the development of**

5    **things-that-could-hurt-us purposes.  And they knew.  Apparently**

6    **they got 24 months because they cooperated, at least that's**

7    **what it appears, but that's a significant difference between**

8    **Mr. He and them.**

9           So let's go on to the others.  **U.S. vs. Ding** referred

10   to by the government.  The object of the conspiracy -- this is

11   looking at the Indictment:  The object of the conspiracy was to

12   provide the materials in question to the China Academy of Space

13   Technology, which according to that Indictment is part of the

14   China Aerospace Science and Technology Corporation, the weapons

15   developers.  Once again, they were involved, and knowingly

16   involved with getting information to the weapons developers, to

17   giving those materials to the weapons developers.  And that is

18   not Mr. He.  That is one reason why the sentence should be

19   different.

20          **Let's go on.  Mr. Chan Hok Shek, which is another one**

21   **cited by the government.  The parts in question were**

22   **specifically listed in the Indictment as "military training**

23   **equipment, components or parts."  And there were charges of**

24   **money laundering.  Clearly military-oriented.  Plus, because of**

25   **the money laundering, and whatever sentence they received, it**

1    **doesn't matter, because it's in contrast to Mr. He.  That's a**

2    **significant difference.  And that fits as well with the facts**

3    **and circumstances of this case.**

4            We know he hid these materials in baby formula.  I

5    mean that's not at issue here.  Yes, he was involved with this;

6    and, yes, it was something that continued over a period of

7    time.  But again we're talking 312 of these things.

8            The next one, which is **U.S. vs. O'Donnell**, involved --

9    we don't have to speculate about any China Academy of Space

10   Technology, or anything, they were holographic weapon sites and

11   gun parts.  Clearly military.  Once again, your Honor, in stark

12   contrast to what we're talking about with regard to Mr. He.

13           Now I think when we're talking about these kinds of

14   cases, and a case such as this, some context such as I have

15   started to provide is important, the context in terms of how

16   Mr. He ended up being manipulated by these folks, and although

17   he was used, certainly hoping that he would get a benefit from

18   it, but starting with reaching out by professionals to make use

19   of him.

20           Secondly, the other cases and the fact that he did

21   not -- Mr. He did not know anything about this being

22   weapons-type materials, in contrast to the way those other

23   folks operated.

24           But also in terms of the way business is conducted

25   generally by these -- by the companies in the states, and

1    apparently around the world, as it applies to materials which

2    could be given to or used by other countries, other places to

3    develop weapons.

4            Of course there's a munitions list, there's a

5    commercial list.  There are a variety of these -- of these

6    lists that we have that stop -- as part of our government,

7    which are designed to stop these materials from going from one

8    place to the other.

9            In my motion for the statutory sentence I made

10   reference to other situations, companies that apparently have

11   zero problem whatsoever selling whatever they can sell to

12   wherever if it means profit for the bottom line.  An example I

13   used, and I gave a site in terms of an article that I had seen,

14   but we're talking about a subsidiary of United Technologies

15   Corporation, which was actually helping the Chinese government

16   develop an attack helicopter.  They get punished by a fine.

17   And apparently the reward they were looking for was possible

18   future commercial development of helicopters in China with

19   billions of dollars in potential profits on the line.

20           Boeing transferring rocket data to China and providing

21   defense services to Russia, and other countries, punished by a

22   fine.

23           And, interestingly enough, Aeroflex.  Aeroflex, the

24   company which is the one that Mr. He did not work for, but who

25   he ordered these 313 parts for.  And what you may be interested

1    to know is that that company just this year, this July, was the

2    subject of what's called a proposed charging letter issued by

3    the U.S. Office of Defense Trade Controls Compliance.  That

4    charging letter made reference to and complained about -- and

5    it's a significant document, I mean it's got I don't know how

6    many pages, but it's -- it talks about how Aeroflex had over

7    through a period of time between 2003 and 2008, that's just

8    five years, had exported over 37,000 ITAR-controlled radiation

9    tolerant microelectronics without state department

10   authorization to - and as my son would say, get a load of this

11   list of countries - Argentina, Austria, Brazil and Canada and

12   Finland and France and Germany.  And I could go on and on, but

13   it includes People's Republic of China, and on and on and on.

14   And that included 14,500 radiation tolerant microelectronics

15   which were exported -- or re-exported to the People's Republic

16   of China, more than half of these after there had been some

17   guidance warning the company about it from the country -- from

18   the overseers here.  And here's a quote from it:

19        These radiation tolerant microelectronics assisted

20   China in improving satellite reliability, hardware and

21   integration; and, further, the exports directly supported

22   Chinese satellites and military aircraft and caused harm to

23   United States security.

24        Now I bring this up -- there was a consent agreement.

25   The company, without admitting fault, said they would comply

1    with certain things in response -- the consent agreement, which

2    itself is a substantial document, in essence says:  Okay, we'll

3    do better.  We'll follow your rules better.  And we're not

4    going to admit any guilt, but we'll pay you an eight million

5    dollar fine, four million of it of which is going to be

6    suspended.

7           That's only part of it.  I mean the striking thing

8    about this is, you look through these documents, is that what

9    these corporations do, what these companies do is they develop

10   these materials -- and this radiation-hardened material that

11   Aeroflex has developed is a great example of this.  They

12   developed these materials, and then they are wanting to sell

13   it, of course, because they are businesses.  And they expend

14   lawyers, policymakers, lobbyists, all kinds of effort over

15   years and years and years butting heads with the compliance

16   people on a regular basis trying to get there to be changes so

17   that these things that they want to sell aren't on the list,

18   and it doesn't -- on the munitions list.  And it doesn't seem

19   to much matter whether or not those things would actually

20   contribute to some sort of lowering of the safety of the United

21   States of America.

22          The helicopters, talking about earlier that General

23   Tech was involved with, I mean they were tank busters.  They

24   were designed to blow up stuff like our stuff on the ground.

25          These kinds of things seem to go on all the time.  And

1   if you were to take the kinds of responses that we see by the

2   punishing agencies and compare them to the kind of devastation

3   that we're talking about that's been visited upon Mr. He for

4   his actions -- yes, I know he hid stuff in baby formula, and of

5   course he was violating the law, that's what he was doing,

6   that's -- and he should be punished for it.

7           And what we see, your Honor, is that the punishment

8   that he has already received, which has been -- he's been in

9   jail for 24 months, which if, you know, you want to do good

10  time, calculation, and the like, makes it more like closer to

11  30 -- probably 28, I am sorry, and look at the impact that it's

12  had upon his life, look what he has done to himself, look

13  what's going to happen in terms of his deportation, if you look

14  at all of that, that impact, that pure, total, complete

15  destruction of him, putting aside his family, which of course

16  has been impacted so significantly as well, if you take that

17  and compare it to the punishments that have been received by

18  these other various defendants, who all knew that they were

19  dealing with weapons, and these corporations who get fines, and

20  none of their people ever see anything that resembles the

21  inside of a jail or see the destruction of their lives, and

22  their shareholders maybe lose a buck, or something, I mean

23  talking about the kind of fines we're talking about, if you

24  compare that, you look at that in terms of the entire context

25  of this, you compare 14,500 of these kinds of items being sent

1    to China by Aeroflex versus his 312, and you compare that, you

2    take that whole mass, that whole weight, and you put that on

3    the scale, however one uses those scales, to who he has been,

4    the contributions he has made, the kind of person he has

5    been -- I mean, your Honor, I know better than to think that

6    you just breezed over those letters.  If you read a more

7    tender, thorough, beautiful description of a man and his

8    contribution to his family than you read from his wife, I would

9    be shocked.

10        The fact that he has from so many different parts of

11   his life, including the part when he sat in jail, where he has

12   shown his contributory nature, his positive nature, the kind

13   of -- the kind of person he has been, his personal

14   characteristics, his history, which of course is part of the

15   measure here.  You put all of that into this package, all of

16   it, and a variant sentence is absolutely appropriate.

17        How is -- how is his reaching for a business goal, how

18   is that more deserving of a higher sentence because he happened

19   to do it in ways that were -- I mean and really is this

20   different in many ways than we're talking about someone who

21   takes money from a bank when they are not supposed to, and

22   sneaks around and hides for 20 years, doing it and ends up, you

23   know, having taken $100,000, so they're looking at a few months

24   in prison?

25        Is it because he had some knowledge that this thing

1     might go toward weapons?  Well, he didn't.  What is it about

2     him that calls for a higher sentence?

3            We ask for 14 months, your Honor.  And I would add,

4     you know, he will, because of the fact that he has this

5     immigration hold on him, because of that he won't be getting a

6     possibility for a camp, he won't be getting a possibility for

7     being released to a halfway house.  He'll serve every day, less

8     whatever little bit of good time the system gives him behind

9     bars.

10           And then of course he'll be sent from this country.

11    And that will lead to problems that we sometimes see or often

12    see with illegal reentry cases, but a very different one in

13    many ways, because of the extraordinarily talented

14    contributions that he has provided.

15           I mean those pictures weren't given you to show just

16    pretty pictures, they were given to you so that you could see

17    not only who he has been, and the kind of things that he has

18    done, and the way that people have responded to him because of

19    the way he has been, but also the grandeur of some of his

20    contributions.

21           We're asking for 24 months, your Honor.  We absolutely

22    think that it's appropriate, and without apology, and in fact

23    think that it is by far the better approach here.

24           THE COURT:  Mr. Kirsch, I will hear from you.

25           MR. KIRSCH:  Your Honor, the government's view is that

1    this is a case in which there is one sentencing factor that

2    stands out and has much greater importance when compared to a

3    number of the other sentencing factors, and the Court has

4    already alluded to that factor, it's the nature and seriousness

5    of the offense that we're dealing with at issue here.

6          The only offenses that are not in the same category in

7    the Sentencing Guidelines that start with higher base offense

8    levels are very serious offenses that involve death or serious

9    bodily injury to other people, they are the murder, murder for

10   hire, attempted murder, kidnapping, sexual abuse of minors,

11   aircraft piracy, promoting commercial sex acts with minors.

12   Those are the offenses in the Sentencing Guideline Manual that

13   start with a higher offense level, because we think of those

14   sentences as the most serious offenses that exist in criminal

15   law.

16          There are a number of offenses that have a lower base

17   offense level that are quite serious – slave trading, robbery,

18   extortion, threat of violence, arson.  All of those start with

19   lower base offense levels under the Guidelines, because in the

20   judgment of the Sentencing Commission those are less serious

21   offenses, at least to begin with, than the one that we're

22   dealing with here.

23          The one that we're dealing with here is grouped with

24   offenses involving national defense and weapons of mass

25   destruction.  The only white collar or nonviolent kind of

1    offenses that I can find in the Guidelines Manual that have a

2    higher base offense level than this one, the one we are dealing

3    with here, are other offenses in that group – treason, selling

4    secrets.  Those are the only kinds of offenses that the

5    Sentencing Commission has deemed more serious than this one.

6         So in response to Mr. Pepin's question:  Yes, this is

7    a very different case than a person who over time embezzled

8    $100,000 from a bank and got caught.  It's a very different

9    offense from that because it implicates much bigger and greater

10   concerns and it potentially has much greater consequences.

11        I want to point out a significant portion of

12   Mr. Pepin's argument had to do with the fact that there are a

13   number of corporations that have been punished for similar

14   conduct only with fines.  There is sort of an interesting --

15   that you could have an interesting philosophical discussion

16   about whether or not that's adequate, but of course at some --

17   at a basic level that argument is a red hearing, because you

18   can't send corporations to jail.  So of course those cases are

19   not going to involve sentences of jail.  Instead, they've

20   involved the only thing you can do to corporations, which is to

21   hit them with far more significant fines than Mr. He or almost

22   any individual who is punished for this kind of offense faces.

23        The seriousness of the offense in this matter is

24   what's driving the government's recommendation for 46 months.

25   That's obviously at the very bottom of the Guideline range.

1    And as the government indicated in its response to his

2  variance, Mr. He has clearly done a number of things in his

3  life that merit credit at sentencing.  We're not arguing about

4  that.  We think given the nature of the offense, the

5  appropriate way to credit him for those things is to put him at

6  the very bottom of the Sentencing Guidelines.

7    If the Court were to decide that that's not enough and

8  that there should be some additional consideration, that could

9  be a reasonable thing for the Court to do.  The government's

10  view is it would not be reasonable for the Court to go almost

11  50 percent below the bottom of the Guidelines to give him

12  credit for those things when we're dealing with an offense that

13  at its core jeopardizes the national security of the United

14  States.

15    THE COURT:  All right.  Ms. Kozak, do you have

16  anything you want to say?

17    THE PROBATION OFFICER:  I have nothing more to add

18  than what the government has already said.  My recommendation

19  was -- the driving force was the seriousness of the offense,

20  your Honor.

21    THE COURT:  All right.  Mr. He, this is your

22  opportunity as part of the criminal sentencing proceeding to

23  make a statement to the Court.  So if you wish to address the

24  Court, please do it at this time.

25    THE DEFENDANT:  Your Honor, I love my adoptive country

1    with all my heart and soul.  My wife and my two boys, we love

2    this country and all it stands for.  The last thing in my mind

3    would be to harm or damage this country where I believe --

4    where my family is going to live here for generations.

5            I never considered that my actions would make the

6    United States more vulnerable, but that is exactly what I have

7    done, or if that is what people believe I have done, I am sorry

8    beyond words.

9            I am sincerely sorry for my crime, both to my family

10    and to this country I love.  I truly regret my actions, and I

11    will not commit any crime in the future.

12            Thank you, your Honor, for your patience and time.

13    And thanks for my attorney, Mr. Robert Pepin, for his highly

14    professional service and deep understanding and passion on my

15    misfortune and helplessness.

16            Thank you.

17            THE COURT:  I want to note something.  In the

18    defendant's letter to the Court, which I read, I alluded to

19    earlier, I want to note something, and this is on page 3, it

20    says, quote, "My life was good and I was working with many

21    talented engineers.  I was looking for ways to earn more money

22    for my family one day.  I was tempted by greed."

23            I want to start there, then I want to read some more.

24    There's obviously nothing wrong or bad about wanting to earn

25    more money for your family.  The problem is you've got to make

1  sure that when you do that you aren't violating the law.  Now I

2  would submit to you, Mr. He, that when you started dealing with

3  your co-conspirators, and you knew they were in China, and you

4  knew the nature of the product they wanted you to export, part

5  of you should have realized I need to go check with somebody to

6  see if what I am doing is legal.  And then when Aeroflex asked

7  you if you intended to export any of these products, and you

8  lied to them, you knew with absolute certainty at that time

9  that what you were doing was a violation of the law.

10         I just wish at that time you would have stopped and

11  pondered about whether or not this greedy tendency, and that's

12  what it was, was worth what you are about to embark on.

13         Now I suspect you didn't know the full consequences of

14  what you were doing, but I think by that point you knew or

15  should have known that to send these integrated circuits to

16  China was in violation of a law, even if you didn't know which

17  law, and that before you did that you had an obligation to

18  think about it and decide if this was worth it.

19         And obviously I think today you would say it wasn't

20  worth it.  But in retrospect it's always easy to say something

21  we did bad we shouldn't have done.  The more difficult

22  situation is when you have the chance either to do the right

23  thing or not do the right thing, sometimes it gets challenging

24  for human beings to do the right thing when they believe that

25  if they do the wrong thing it's going to put money in their

1    pocket.

2            You ended up in the worst of situations.  You didn't

3    make any money off of this.  And you ended up in a situation,

4    because you are not a United States citizen, you are likely to

5    be deported.  I have no control over that, and I can't let that

6    influence -- unduly influence what I do here.  And I think you

7    have put your life in an irreversible position, because I think

8    the odds are you will get deported, and I suspect you will be

9    deported back to China, because that appears to be your home

10   country.  And I just don't know if the laws would ever allow

11   you to return to this country.  Even if they did, you couldn't

12   resume the career you had.  I think that's unfortunate.

13           I just want to say that I am not saying this to beat

14   you up or put guilt or undue pressure on you, but I want you to

15   understand that fundamentally when you were considering

16   pursuing this opportunity, because you thought you could make

17   some quick easy money, that had to be what it was, I wish you

18   would have had the foresight to think about someone other than

19   yourself, to go talk to somebody, and understand that what you

20   were about to embark on was a serious violation of the law that

21   had dire personal consequences to you and your family.  So,

22   anyway, I just say that for what it's worth.

23           Let me just read the rest of this, because I want the

24   record to be clear:  I know it was -- continuing after the part

25   I just read:  I know it was wrong and I deeply regret I took

1    that step.  I am sorry I broke the law, and I am also very

2    sorry I cost the government time and money to receive my case.

3    I grief for my family.  My bad decision has cost them dearly,

4    etc., etc.

5            So the Court appreciates your letter.

6            Let me tell you what I am going to do.  This is a

7    difficult case.  I tend to think that there's some limited

8    merit to the motion for a statutory sentence, but that

9    statutory sentence can't be 24 months.  A 24-month sentence is

10   not adequate punishment for what this defendant did.  He

11   committed a serious crime.  And I don't care how exemplary his

12   life was before, or how many pictures I get with letters

13   attesting to his virtuous life, him being a great family man,

14   they just don't trump what he did.

15           I mean I guess I don't understand human beings.  I

16   have been doing this now approaching 20 years, and it just

17   baffles me why in a retrospective way it's so obvious what

18   somebody should have done, but then at the time the person has

19   the opportunity to choose right or wrong, oftentimes greed,

20   money, the opportunity to do something that may be exciting

21   trumps common sense over judgment.  It's unfortunate.  Again, I

22   am not saying this solely for Mr. He.

23           So I think a modest variance is warranted, and I

24   emphasize a "modest variance."  And I think that it at least

25   tells the defendant that because he has been a model

1    prisoner -- I think it's wonderful he has been working with

2    inmates, he's helped folks get GEDs, he's pursued some studies

3    to the extent he can while incarcerated.  I think some of that,

4    coupled with his prior life, convinces me, along with the

5    fact -- I think Mr. Pepin made some good points about there

6    being some distinctions between sentencing judgments given by

7    the government in other cases and Mr. He's case.  Now I don't

8    know that the differences justify -- they don't justify the

9    departure Mr. Pepin is requesting, but at least I think they

10   put those judgments in context.

11          So for all those reasons the Court will impose a

12   modest variance, and when I impose the sentence I will announce

13   that.  And, Mr. He, this Court wishes you the best.  And part

14   of what I was attempting to say, and I will say more bluntly,

15   you put yourself in a very difficult situation.  I will always

16   say anyone who is here other than as a citizen, you've got to

17   remember that when you violate the law, the odds are that you

18   are going to be hurt more severely than somebody who is a

19   citizen.  It's just the way the laws work.  Our immigration

20   laws are flawed in many respects.  I have no ability to change

21   them, but I will just say that they are flawed.  But me saying

22   that doesn't provide you with any comfort or benefit, because I

23   have no ability to change the immigration laws, only Congress

24   can do that.

25          So you just have to figure out how to pick up the

1    pieces here, move forward with your life, not feel unduly sorry

2    for yourself, and decide how you can provide for your family.

3            I have a question.  Is your wife an American citizen?

4            THE DEFENDANT:  No, she's a permanent resident.  My

5    two sons are citizens here.

6            THE COURT:  Okay.  I am just asking this for

7    informational purposes.  Assuming you were deported by the

8    government, and again that's independent of whatever I might

9    do, do you know where you are likely to be deported?

10           THE DEFENDANT:  First, I don't know; and, second, I am

11   trying my best to -- even as everyone -- one person -- intend

12   to stay with my family here to provide anything I could for my

13   family, I would -- working the immigration case, try to stay

14   with them.

15           THE COURT:  If you get deported, and I don't wish that

16   on you, but if it happens, will your family remain here in the

17   United States or will they accompany you to China, if you know?

18           THE DEFENDANT:  Because my -- all my family, my wife

19   and my boys have been here for so long, and they have been --

20   actually that's one of the reason I like to be here, because I

21   admire the country here and their education system.  And my

22   son's doing very well working with the school and teachers, and

23   get great help.  So I will think that he will remain here and I

24   will try to -- try my best to find a way to be forgiven and

25   come back.

1        THE COURT:  When did you last see your wife and

2    children?

3        THE DEFENDANT:  That's a year and a half -- it's a

4    year -- about a year and a half, at least -- oh, I mean my wife

5    fly -- flew here to see me once, that's about a year and a half

6    ago.

7        THE COURT:  And did your children come with her?

8        THE DEFENDANT:  No, because they are in school.  And

9    then also I didn't want to negatively impact them so far.  So

10   mommy told them that daddy is working outside.

11       THE COURT:  Okay.  How old are your children today?

12       THE DEFENDANT:  When I get arrested my children were

13   eight and four.  Right now they are ten and six.

14       THE COURT:  Okay.  All right.  Is there anything else

15   before the Court imposes sentence?

16       MR. PEPIN:  No, sir.

17       MR. KIRSCH:  No, your Honor.

18       THE COURT:  All right.  In the matter then of United

19   States of America vs. Philip Chaohui He, Case

20   No. 11-cr-00519-1, the Court determines that no finding is

21   necessary concerning the objections to the Presentence Report,

22   because the controverted matters will not be taken into account

23   in imposing sentence nor will they affect the sentencing

24   decision by the Court.

25       Neither the government nor the defendant has

1    challenged any other aspect of the Presentence Report;

2    therefore, the remaining factual statements and Guideline

3    applications are adopted without objections to the Court's

4    findings of fact concerning sentencing.

5         The Court finds the total Offense Level is 23 and the

6    defendant's Criminal History Category is I, which results in an

7    imprisonment range of 46 to 57 months and a fine range of

8    10,000 to $100,000.  The supervised release range is one to

9    three years.

10        For many of the reasons noted in the defendant's

11   motion for statutory sentence, which I am not going to repeat,

12   because I think they're fully expressed and articulated in

13   Mr. Pepin's motion, the Court finds that a variant sentence is

14   warranted and the sentence that the Court will -- and the

15   sentence which the Court will impose is sufficient but not

16   greater than necessary to meet and accomplish the sentencing

17   objectives found at 18, United States Code, Section 3553(a).

18        Also I incorporate by reference Mr. Pepin's comments

19   about how these judgments from other courts are different in

20   some respects, and some factual circumstances, from what the

21   defendant was involved in, although the ultimate law violations

22   are the same.  And that's really the problem here, these are

23   serious law violations.  But with that said, a modest variance

24   will be granted.

25        So with that said, pursuant to the Sentencing Reform

1   Act of 1984 it is the judgment of the Court that the defendant,

2   Philip Chaohui He, is hereby committed to the custody of the

3   Bureau of Prisons to be imprisoned for a term of 36 months.

4           Upon release from imprisonment the defendant shall be

5   placed on supervised release for a term of three years.  Within

6   72 hours of release from the custody of the Bureau of Prisons

7   the defendant shall report in person to the probation office in

8   the district to which the defendant is released.  While on

9   supervised release the defendant shall not commit another

10  federal, state or local crime, shall not possess a firearm, as

11  defined in 18, United States Code, Section 921, and shall

12  comply with the standard conditions that have been adopted by

13  the Court.

14          If this sentence involves a fine and restitution as a

15  condition of supervision, the defendant pay in accordance with

16  the schedule of payments sheet set forth in the judgment.

17          The Court waives the mandatory drug-testing provisions

18  of 18, United States Code, Section 3583(d) because the

19  Presentence Report indicates a low risk of future substance

20  abuse by the defendant.

21          The defendant shall cooperate in the collection of DNA

22  as directed by the probation officer.

23          The Court finds the following special condition of

24  supervised release is determined to be reasonably related to

25  the factors enumerated in 18, United States Code, Section

1    3553(a) and 18, United States Code, Section 3583(d); further,

2    based on the nature and circumstances of the offense and the

3    history and characteristics of this particular defendant, the

4    following condition does not constitute a greater deprivation

5    of liberty and are reasonable and necessary to accomplish the

6    goals of sentencing.

7         The condition is as follows:  If the defendant is

8    deported, he shall not thereafter reenter the United States

9    illegally.  If the defendant reenters the United States

10   illegally, he shall report to the nearest U.S. Probation Office

11   within 72 hours of his return.

12        Now I am just going to say this for what it's worth,

13   Mr. He.  If you get deported, and if you reenter this country

14   illegally, you face other legal problems; because if you get

15   caught you will get charged with illegal reentry, and that has

16   a whole set of adverse punitive consequences.

17        So I wish you the best in attempting to find a legal

18   way for you to stay here, or come back, but if you can't find

19   that and you decide to come back to this country illegally, I

20   want you to think seriously about the adverse consequences of

21   that decision.

22        All right.  Continuing on with the sentencing

23   statement.  Let me just ask this.  The proposed sentencing

24   statement has a fine of $5,000.  Does the defendant have the

25   ability to pay a fine?

1          MR. PEPIN:  Your Honor, he himself where he is now,

2     no.  Any resources -- I think I pointed out in my motion, any

3     resources he has he shares with his wife, who is trying to live

4     off of it.  So it's our position that although I suppose one

5     could stretch it and say that he has some ability to pay a

6     fine, I'm not sure where it would come from.  He is likely to

7     be deported and any money that would be taken from that

8     household would stretch the resources of the family that is

9     already suffering.

10          THE COURT:  I am just inclined here -- since I've

11     given him at least some additional limited time in jail, to

12     impose a fine, unless it's something the government or

13     probation believes must be imposed.  Even if you do, I don't

14     think I am going to do it.

15          Mr. Kirsch, what is your position on fine?

16          MR. KIRSCH:  Your Honor, we did ask for a fine.  It's

17     not something we believe must be imposed, but we certainly

18     think it would be appropriate.  According to the contents of

19     the Presentence Report, which weren't challenged, Mr. He has a

20     total net worth of over $107,000.  A $5,000 fine is a

21     relatively modest additional punishment, given that net worth.

22          THE COURT:  So, Mr. He, if I impose a fine, how are

23     you going to pay it?

24          THE DEFENDANT:  I don't know, because although it says

25     I have equity of a hundred thousand, that's a lot of this

1   because my wife is -- the house she rented out to try to keep

2   the house, so just one day probably she can find a job and then

3   can go back to the house and live there again.  And for actual

4   money, she has in the bank I think it's -- it's about $11,000.

5   So if we with take about $5,000, that's about 40 percent of

6   what she has as a cash flow right now.

7        Yes, like Mr. Pepin said, if it has to be stretched

8   then, yes, maybe she can.  But that's still taking about 45

9   percent -- or 40 percent of all she has in the bank right now.

10  And she has to take care of two kids and also --

11       THE COURT:  Hold on.  I've heard enough.  Let me just

12  say -- there's always a humanitarian component of sentencing,

13  and I just think to impose a fine in this circumstance doesn't

14  make any sense.  So when I think something doesn't make sense,

15  I don't do it.  So I am not going to impose a fine.  However,

16  you are ordered to pay a special assessment of $100, because

17  that is mandatory.  But based on the totality of the record

18  here, the Court will not impose a monetary fine.

19       Mr. He, you are advised of your right to appeal the

20  sentence I have just imposed.  If you desire to appeal, a

21  notice of appeal must be filed with the clerk of the Court

22  within 14 days after entry of judgment or your right to appeal

23  will be lost.  If you are unable to afford an attorney for an

24  appeal, the Court will appoint one to represent you.  If you so

25  request, the clerk of the Court must immediately prepare and

1   file a notice of appeal on your behalf.

2          All right.  The government has filed a couple of

3   things.  It's filed a motion for the third point, which I will

4   grant.  And, further, I will grant the government's motion to

5   dismiss with prejudice Counts 2 and 3 of the Indictment, and I

6   will enter an order to that effect.

7          All right.  We're done.

8          MR. PEPIN:  Thank you.

9          THE DEFENDANT:  Thank you.

10      (Proceedings concluded at 11:21 a.m.)

11                    **REPORTER'S CERTIFICATE**

12      I certify that the foregoing is a correct transcript from

13   the record of proceedings in the above-entitled matter.  Dated

14   at Denver, Colorado, this 13th day of February, 2014.

15

16                              _____

17                                      s/Gwen Daniel

18

19

20

21

22

23

24

25